U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2019 NOV 19 P 1: 57

STEPHEN C. DRIES
CLERK

# UNITED STATES DISTRICT COURT

## IN THE EASTERN DISTRICT OF WISCONSIN

---

**OLTON DUMAS**

**1519 Wisconsin Ave.**

**Beloit, WI. 53511**

**PLAINTIFF, PRO SE;**

**19-C-1702**

-VS-                                                    CASE NO. _____

**TRAVELERS PROPERTY CASUALTY CO. OF AMERICA,**
**One Tower Square**
**Hartford, CT 06183, et al;**

**Amanda Tufano, and Jessica Raney, Adjusters,**
**who is registered agents for service of process is**
**in the State of Illinois, located at**
**P.O. Box 3205,**
**Naperville, IL. 60566-7025, et al;**

**KENOSHA BEEF INTERNATIONAL LTD, et al; and**
**Natolie Murray, Employer's Worker's Compensation Rep**
**doing business as Birchwood Foods; et al;**
**3111 152nd Ave.,**
**Kenosha, WI. 53144,**

1

CHAPIN & ASSOCIATES; and Richard C. Davis;
13935 Bishops Drive, Suite 250,
Brookfield, WI. 53005, et al;

and,

J. JAY GOODMAN;
5150 North Port Washington Rd., #151,
Milwaukee, WI. 53217

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2019 NOV 19 P 1: 57

STEPHEN C. DRIES
CLERK

DEFENDANTS.

**19-C-1702**

## COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

## AND JURY DEMAND

### I. JURISDICTION AND VENUE

1. Federal question jurisdiction is conferred by Plaintiff's claim under the Federal Racketeer Influence and Corrupt Organizations Act, 18 USC sec. 1961 et seq. (RICO). Diversity of citizenship jurisdiction is conferred by 28 USC sec. 1332 (plaintiff is a citizen of Wisconsin, and some defendants are citizens of other states, and the amounts in controversy exceed $75,000). Pendant jurisdiction of state claims is conferred by 28 USC sec. 1367.

2. Venue is properly laid in the Federal District Court for the Eastern District of Wisconsin because Plaintiff resides in that district and Defendants do business in person and through their agents and representatives in that district, in Kenosha and Waukesha Counties, Wisconsin. Dr. J. Jay Goodman does business in Milwaukee County, Wisconsin, and resides within the jurisdiction of this court.

## II. PARTIES

3.

A. Plaintiff OLTON DUMAS, at all times relevant to this action resided at 3514 50th Street in Kenosha WI., until recently, now forced to reside at 1519 Wisconsin Ave., Beloit, WI. 53511, as a result of his inability to maintain rent due to Defendants' conduct. Plaintiff an employee of Kenosha Beef International LTD in Kenosha County, Wisconsin.

B. Defendants TRAVELERS PROPERTY CASUALTY CO. OF AMERICA, One Tower Square Hartford, CT 06183.

C. Defendants Amanda Tufano, and Jessica Raney, Adjusters, who resides in the State of Illinois located at P.O. Box 3205, Naperville, IL. 60566.

D. Defendants KENOSHA BEEF INTERNATIONAL LTD, et al., and Natolie Murray, Employer's Worker's Compensation Rep. Employee, doing business as Birchwood Foods; et al; conducting its daily business at 3111 152nd Ave., Kenosha, WI. 53144.

E. Defendants CHAPIN & ASSOCIATES, and Richard C. Davis, resides and/or does daily business in the State of Wisconsin, located at 13935 Bishops Drive, Suite 250, Brookfield, WI. 53005.

F. Defendant J. JAY GOODMAN; resides and does business in the State of Wisconsin, located at 5150 North Port Washington Rd., # 151, Milwaukee, WI. 53217.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS

4. Defendant KENOSHA BEEF INTERNATIONAL LTD, et seq (herein "Kenosha Beef"), doing business as Birchwood Foods, employed the Plaintiff. It complied with its obligation, arising under the Wisconsin Worker's Compensation Act, Chapter 102, Wisconsin Statutes, et seq (herein "the Act"), to provide its Wisconsin employees with Wisconsin worker's disability compensation insurance, either by signing a contract of insurance with Travelers Prop Cas Co of America, et seq (herein "Travelers"), or by self-insuring. Travelers adjusted workers compensation claims made by Kenosha Beef employees.

3

5. Decisions regarding paying claims, prolonging or delaying payments or terminating them were made jointly by defendants, or were made by Travelers after consulting with Kenosha Beef, or were ratified by Kenosha Beef after being made by Travelers. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. The persons with decision power at Kenosha Beef, Travelers and Chapin & Associates formed an "enterprise" for purposes of the Racketeer Influence and Corrupt Organizations Act (RICO).

6. In conjunction with paragraphs 4., and 5.,:

A. One or more of these persons committed by mail fraud, wire fraud and/or conspiracy to defraud, in a repeated and continuing pattern, by creating and disturbing an intentional "*fraudulent misrepresentation*" which allegedly described the contents of a "surveillance" video, that were false, and distributing that intentional "*fraudulent representation*", as a means to fraudulently prolong, delay, terminate and/or deny payment of benefits. This fraud was accomplished in part by use of the United States mails and/or by electronic communications in violation of 18 USC 1341 and 1343, and in violation of Wisconsin Statutes secs. 943.39, 943.82, 943.89, and 943.90. Some of these electronic and mail communications did not contain fraudulent misrepresentations, the fraudulent misrepresentations were merely one of the means by which Defendants achieved their scheme of intentional fraud. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

B. This fraud was also accomplished in part by Kenosha Beef and Travelers deliberately selecting Dr. J. Jay Goodman, to get a medical opinion which Defendants could use to prolong, delay, terminate and/or deny benefits to Plaintiff, rather than to get an objective opinion from a qualified specialist to help Defendants decide whether Plaintiff were in fact entitled to benefits. Defendants' knew that there was no reasonable basis in fact or law to justify prolong, delay, terminate and/or deny benefits. Travelers, Kenosha Beef, and/or their attorneys, {Defendants Chapin & Associates, et al.}, intentionally distributed that "fraudulent

4

misrepresentation" to Dr. Goodman, whom relied on it to prepare his Medical Record Review Report (herein after "Report"), wherein Dr. Goodman relied on and made reference to that "fraudulent misrepresentation", allegedly describing the "surveillance" video, without first observing the evidentiary content. That "Report" was also distributed to Plaintiff. Travelers, Kenosha Beef, and their attorneys knew Dr. Goodman, whom they employed to do a Medical Record Reviews, were a "cut off" doctor, that is, a doctor upon whom Travelers, and Kenosha Beef could rely for an opinions which they could cite as grounds for prolonging, delaying, terminating and/or denying, {cutting off} benefits, either by stating Plaintiff were able to work or his injury was not work related. Dr. Goodman received substantial income from Defendants. Travelers, and Kenosha Beef's pattern of paying large sums of money for doing "cut off" reports in workers compensation litigation and the express or implied promise of future payments of money for doing reports, constituted an intentional corrupt persuasion, misleading conduct and obstruction of justice, within the meaning of 18 USC sec. 1512. Defendants' used electronic and mail communications in furtherance of their intentional scheme of fraud, in violation of 18 USC secs 1341, 1343 and 1512. This fraud was also accomplished by Defendants' deliberately ignoring communications from objective doctors and specialties, indicating Plaintiff did have a work-related aggravation injury. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

C. Plaintiff's damages were proximately caused by Defendants' scheme by fraudulent and dishonest conduct by distributing the intentional "fraudulent misrepresentation" to prolong, delay, terminate and/or deny the payment of benefits. Mail and electronic communications were used by Defendants in furtherance of this scheme. Some of these communications contained fraudulent misrepresentations to Plaintiff, but others did not. Defendants' use of mail and electronic communications in furtherance of their fraud violated 18 USC sec. 1341

5

and 1343, which Plaintiff relied on in order to pursue his claim for owed benefits.

D. Some of the acts of mail fraud and wire fraud consisted of communications between Defendants; Defendants' and Plaintiff; and Defendants' and Dr. Goodman, the "cut off" doctor whose "Report" Defendants relied upon for terminating, denying, delaying and/or prolonging payment of benefits. In these communications, Defendants' discussed means of cutting off Plaintiff's benefits and/or forcing him to partake in their settlement scheme, at less than the true value, after terminating, delaying, and/or prolonging payments for an extensive amount of time. Even though Defendants' possessed medical reports from treating doctors stating Plaintiff did have a work-related aggravated injury. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

E. In conjunction with paragraphs A., through D., Plaintiff's reliance upon Defendants' intentional fraudulent conduct, understanding that he had to establish this fraudulent conduct before a court of law, caused Plaintiff to suffer financial losses of having to take out loans, in order to litigate his cause, [-because attorneys would not take the case due to the type of injury it was. Those attorneys stated that "there was not enough money in a hernia claim], to maintain his living arrangement, to save his automobile, to pay other living expenses, which placed Plaintiff in large sums of financial debts, as an approximate cause of the Defendants' intentional fraudulent conduct. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

F. In conjunction with paragraphs A., through E., Plaintiff, as a direct cause of Defendants' fraudulent schemes, compelled him to file for Short Term Disability Benefits with his Group Health Insurance through the employer. This benefit only paid Plaintiff an approximate net weekly wages of about $200.00. Plaintiff under his weekly wage prior to the work injury netted about 1,000.00, and had he been properly paid his worker's

6

compensation benefits, he would have received 2/3 of this weekly wages, according to Wisconsin Worker's Compensation Act. Defendants' utilize tactics of delaying payments of medical and lost wages in their worker's compensation, to circumvent their statutory requirement to pay the worker's compensation benefits stated under their contract clause. This is done to shift liabilities to the employee Group Health Insurance Carriers; with no intention of reimbursing that health insurance company for those Short Term Disability Benefits paid out. Plaintiff's approximate cause of injury was when Defendants' used their intentional fraudulent conduct to reduce Plaintiff's entitlements by forcing him to seek reduced wages benefits through his Group Health Insurance, which depressed Plaintiff's wages. The subsequent excessive delay caused him to experience extreme emotional conditions, including but not limited to suicidal thoughts, intense anxiety, and migraines, these stressful conditions is believed, were meant to cause the Plaintiff to give up on his claim, to minimize the amount of the Defendants' liability or to cause the Plaintiff to starve. Taking advantage of those conditions, presented their settlement offer to Plaintiff, knowing he was not represented by an attorney and vulnerable. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

7. At all times and in all actions plead in this complaint, Travelers, et al; Chapin & Associates, et al; and Dr. Goodman was acting as agents for, or in concert with Kenosha Beef. That Travelers at all times relevant to their actions, provided an online website entitled "MyTravlers.com" wherein Plaintiff was contacted by Travelers and replied through this website, with regards to worker's compensation benefits issues, and used that website to communicate with Travelers concerning their intentional fraudulent misrepresentation; communications were also conducted by mail with Travelers and other Defendants. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

# III. RICO COMPLAINT OF OLTON DUMAS AGAINST DEFENDANTS

### WORKER'S COMPENSATION INTENTIONAL BAD FAITH ACTS

#### JUNE 20, 2018 WORK RELATED INJURY CLAIM:

8. In conjunction with paragraphs 1., through 7., On June, 19, 2018, through June 20, 2018, Defendants' Kenosha Beef recorded a "surveillance" video of Plaintiff's general work area, to subsequently be used by them in an insurance claim litigation process, and subsequently, was used for that purpose.

9. In conjunction with that paragraph 8., this "surveillance" video shows Plaintiff moving machinery by himself, in Kenosha Beef International, South Production area, the direct subject of the work-related injury.

10. In conjunction with that paragraph 9., as a result of this work duty, Plaintiff sustained a work-related injury to his left leg groin area.

11. In conjunction with that paragraph 9., and 10., Plaintiff submitted a work-related injury report to his employer as a result of the work injury he sustained.

12. In conjunction with that paragraph 9., through 11., on June 20, 2018, the work-related injury was reported to the employer, that at approximately 3:00 am, the employee pulled a muscle in his Left Leg, as a result of moving machinery in the South Production Pack-off area.

13. In conjunction with paragraph 12., this work-related injury subsequently caused Plaintiff to seek medical attention with the Aurora Occupational Health the same day. This pulled muscle in the Left Leg was later examined by Dr. Terry Zehr, M.D., as      a "Left Groin Pain". Who returned Dumas to work with restrictions, and to be re-evaluated by General Surgery Specialist, Dr. Licup, which was scheduled for June 25th, 2018.  SEE EXHIBIT # 1, attached

14. On June 25, 2018, Plaintiff was examined by General Surgery Specialist, Dr. Licup, whose assessment states:

"Olton Dumas is a 61 year old male with symptomatic

8

and reduceable LEFT inguinal hernia."

He recommended surgery, hernia repair with mesh, and further required a preoperative clearance from Primary Care Provider, prior to surgery, including Chest X-ray, EKG and Labs. This preoperative clearance was conducted on July 2, 2018, as ordered by Dr. Ghanayem-Bouikidis, Plaintiff's Primary Care Provider.

15. Plaintiff's first day of loss wages was July 16, 2018, as he prepared for the early morning surgery conducted on July 17, 2018. Plaintiff was subsequently off work healing to approximately August 14th, 2018.

16. In conjunctions with paragraphs 13., through 15., on July 21, 2018, Plaintiff received a letter from Connie Keeton, Travelers' Claim Adjuster, which informed Plaintiff that Travelers' and Kenosha Beef International had paid in full the recent medical care provided him.  SEE EXHIBIT # 2, attached

17. In conjunctions with paragraphs 16., on or about July 23, 2018, Plaintiff made contacted with Travelers, in regards to receiving pay for his loss wages from July 16, 2018 to July 23, 2018, or whether they had processed that pay.

18. In conjunctions with paragraphs 17., on July 24, 2018, Plaintiff received a phone call from an Unknown Agent of Defendant(s), who informed him that a "video" was reviewed of the area where he had sustained the work-related injury, and it is determined that the injury did not occur at work. Defendants' at this junction, had intentionally prepared a "fraudulent misrepresentation" to be subsequently used in carrying out their scheme. Defendants' Travelers and Kenosha Beef have practiced a posted "ZERO-TOLERANCE POLICY ON FRAUD", and assert that any employee that commit fraud will be prosecuted to the fullest. Including a $150,000 fine.

19. In conjunctions with paragraphs 18., on July 24, 2018, Plaintiff in reply to the Unknown Agents' assertions, sent an e-mail to Travelers, to inquire as to being denied worker's compensation benefits, on the alleged basis of information of a "video", that showed others had help Plaintiff move machines on wheels on the date of injury. SEE EXHIBIT # 3, attached

20. In conjunction with paragraph 19., on July 25, 2018, Plaintiff received a response from Travelers' Agent, Defendant Jessica Raney, Claim Adjuster, whom states that she was sorry that the decision on my claim was not favorable.

9

21. Plaintiff in reply to Defendant Jessica Raney's e-mail, informed Travelers that the Employer was advancing a "false representations" with regards to a "video", to justify terminating/denying prolonging and/or delaying benefits to him. SEE EXHIBIT # 4, attached

22. In conjunction with paragraphs 18., through 21., later on that same day of July 25th, 2018, Defendant Jessica Raney wrote what is believed to be Travelers' "Denial Letter", stating in relevant part:

> "Based on the information we have received, we are
>
> unable to accept your claim for workers' compensation
>
> benefits. As such, please submit your medical bills to
>
> your group health insurance carrier"….

SEE EXHIBIT # 5, attached

Defendants' relying on nothing other than the term "INFORMATION", a communication, whether 'written and/or verbal', as its basis to deny the claim, this same term was used by other Defendants when making decisions in this matter. We later found out that when Defendant Dr. Goodman used the term "INFORMATION" was referring to a communication whether 'written and/or verbal, in reference to a description depicting a "Surveillance" video used by him in a medical Report. Defendants' at this time terminated the paying of medical benefits to Plaintiff's care providers, and never begin paying Plaintiff. Defendants' knew or had a reason to know that there was no reasonable basis in fact or law that justified their denial and Defendants' had knowledge or reckless disregards of the lack of a reasonable basis for denying the benefits.

23. In conjunction with paragraphs 6.F., and 22., Plaintiff subsequently commenced a claim with his Group Health Insurance Carrier, for a Short-Term Disability Benefit, which Plaintiff believe was an attempt to set in motion their process to defraud Plaintiff's Insurance carrier, as well as the Plaintiff. Plaintiff applied with the Worker's Compensation Division for a Hearing seeking Worker's Compensation Benefits. This Hearing Application request was received by the Worker's Compensation Division on July 31, 2018, with a copy attached of the "Practitioner's Report on Accident or Industrial Disease In Lieu of Testimony", claim opened on August 14, 2018, as WC CLAIM NO: 2018-016081.

This claim continued for 13 months, with Plaintiff having no financial means to maintain his livelihood in a manner previously held before the work-related injury. Plaintiff was forced to borrow money from loan institutions at high rates of interests, in order to keep a place to live, transportation, and daily food to eat. Defendants' continued to prolong payments of the back wages, which pushed Plaintiff further in debt and hardships, and caused Plaintiff to be subjected to evictions, and other threats.

24. In conjunction with paragraph 23., consequently, Plaintiff received a copy of the respondents' "ADMISSION TO SERVICE AND ANSWER TO APPLICATION" signed by Defendant's CHAPIN & ASSOCIATES and Richard C. Davis, on September 5, 2018, wherein it is advanced that their *'matters in dispute and reasons for denying liability',* to wit:

> "Inconsistencies in history and reporting. Medical records
>
> indicated unknown causality. Investigation continues"

### SEE EXHIBIT # 6, attached

25. In conjunction with paragraphs 19., through 24., Plaintiff sought to be provided a copy of the work "video" relied on by respondents, as their primary basis for denying the workers' compensation benefits. Plaintiff encountered much resistance from respondents, in being provided a copy of the alleged work "video". From July 24, 2018, to October 29, 2018, when Plaintiff resulted to a Discovery Process to compel its production. Upon Defendants CHAPIN & ASSOCIATES, through Attorney Richard C. Davis, being provided the "video" there was no "fairly debatable" issue, especially after Plaintiff's Care Providers had concluded that the injury was an "Aggravation" of a pre-existing condition. However, Defendants' elected to establish what they believed would create a "fairly Debatable" issue, when the fraudulent conduct practice was put in play. SEE EXHIBIT # 15, attached

26. In conjunction with paragraphs 25., subsequently, Plaintiff was provided a copy of this "video", by Defendants' CHAPIN & ASSOCIATES, through Attorney Richard C. Davis. Upon Plaintiff's review of respondents' work "video", it became apparent, that the employer and Travelers had acted in BAD FAITH. A review of this "video" evidence clearly displayed two different dates and times

relevant to work-related injury, when machinery was being moved alone by Plaintiff:

   a). -The FIRST, shows when the Conveyor-belt, with machinery attached was being moved, which occurred at approximately 11:42:40.589 PM, on June 19, 2018;

   b). -The SECOND, shows when the Stacker(s) machinery was being moved, which occurred at approximately 12:09:58.620 AM, on June 20, 2018.

SEE EXHIBITS # 7, AND # 8, attached

## DEFENDANTS' INTENTIONAL FRAUDULENT MISREPRESENTATION ACTS:

27. In conjunction with paragraphs 26., it is on this *FIRST* showing, dated June 19, 2018, at 11:42:40.589 PM, regarding the Conveyor-belt machinery, of which the respondents' rely as its basis for their Denial Letter. The FIRST showing and the SECOND showing, both present the true fact, that the moving of the machinery was conducted by the Plaintiff by himself; no one assisted him in moving machinery during the eight (8) hour shift time. The work "Surveillance" video, at issue here, depict the eight (8) hour shift which begin at 11:00 pm, of June 19, 2018, and ended at 7:30 am, of June 20, 2018. The work injury was alleged to the employer as having occurred at approximately 3:00 am, on June 20, 2018; and reported to the Third Shift supervisor at approximately 6:45 AM, on June 20, 2018. After a close review of the "Surveillance video", it became abundantly clear, that someone had prepared a "fraudulent misrepresentation/writing" contrary to Section 943.39, of the Wisconsin Statutes. Defendants' presented a falsified representation, letter, report, memo, or documentation which provided a misrepresentation of that "Surveillance video", used as evidence in the decision-making process to file their Denial Letter; and relied on by Defendant Dr. Goodman, M.D. for preparing his "Report".

28. In conjunction with paragraphs 25., through 27., there was fraudulent "Information" manufactured by Defendants' to fabricate the facts, displayed in the "Surveillance" video. This fabrication was intentionally and maliciously prepared and distributed in furtherance of Defendants' conspiracy to prolong, delay and/or deny Plaintiff an entitlement to workers compensation benefits,

12

Case 2:19-cv-01702-JPS   Filed 11/19/19   Page 12 of 23   Document 1

this conspiracy has caused Plaintiff to suffer mentally, physically, and financially, as a direct result of their intentional and malicious fraudulent misrepresentation, which prolonged or delayed the payment of entitled benefits owed to Plaintiff, which subsequently injured him. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

29. In conjunction with paragraphs 27., and 28., Defendants' sought out and employed this Independent Medical Examiner, Defendant Dr. J. Jay Goodman, M.D., to conduct a medical record review regarding the Plaintiff, to determine causation relative to a work incident reported to have occurred on June 20, 2018, at approximately 3:00 AM.  SEE EXHIBIT # 9

30. In conjunction with paragraphs 29., Defendant Dr. J. Jay Goodman, M.D., prepared and distributed the Medical Record Review Report, ("Report"), dated February 15, 2019, wherein makes reference to the "Surveillance" video, and submitted that "Report" to Defendant Tufano.


31. In conjunction with paragraphs 29., and 30., pursuant to Defendant Dr. J. Jay Goodman, M.D, "Report", at page 2, "HISTORY", portion, states:

> (1).    "...Mr. Dumas has more responsibilities relative to cleaning than moving machinery based on the job description."

{id at para., 2., line 3-4}

> (2).    "On or around June 20, 2018, Mr. Dumas alleges that he pulled his left groin while moving four machines away from a conveyor belt in order to clean meat from behind the conveyor."

{id at para., 3, line 1-3}

> (3).    "Information provided to me stated that:
>
> -surveillance was reviewed between June 19, 2018 and June 20, 2018.

13

-There was an incident of Mr. Dumas moving two
piece of machinery that were on wheels and weighed
approximately 50 to 70 pounds. There was a reported
another machine on wheels weighing 200 pounds.
Three people moved this machine a short distance
without any issues.

{id at para., 3, lines 5-9}

SEE EXHIBIT # 10, attached


32. In conjunction with paragraph 30., and 31., Defendant Dr. Goodman,
outlined a set of factors, allegedly from "information" someone intentional
misrepresented to him, either by, letter, report, memo, or documentation,
created after reviewing the "Surveillance" video between June 19, 2018, and
June 21, 2018. This alleged "Information" provided to Defendant Dr. Goodman,
from the "Surveillance" reviewed, conclude that:

"Three people moved this machine a short
distance without any issues."

{id at para. 3, line 9}.


33. In conjunction with paragraphs 32., Defendant Dr. Goodman in this
"Report", at Page 3, through 4, "Report" at page 3, "MEDICAL RECORDS
REVIEWED" portion, states:

"All records provided to me were reviewed
and are as follows:"

{id. at pages 3., through 4.,}.

In this portion of Defendant Dr. Goodman's "Report", he set forth specifically 6
paragraphs of Records provided to him for review, neither of those 6 Records
show any mention of a "Surveillance" video, having been given to him for
review. Nor was any document listed of a narrative of that "Surveillance" video,
which had been provided to Defendant Dr. Goodman, M.D. for his review.

These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. SEE EXHIBITS #11, and #12, attached

34. In conjunction with paragraphs 30., and 33., Defendant Dr. Goodman's "IMPRESSION" at pages 4., of his "Medical Record Review Report" portion, states:

>"My opinions are based on the following facts:
>
>The specific work incident of moving machinery on wheels with varying degrees of weight and materials would not be the type of physical activity that would result in either a left inguinal hernia or bilateral inguinal hernia."
>
>{id. at page 4, para. 2, lines 1 through 4}.

SEE EXHIBIT #12, attached


35. In conjunction with paragraphs 25., through 34., it is clear from Defendant Dr. Goodman's "Report", that he relied on the fraudulent misrepresentation {-Information} provided to him regarding a "Surveillance" video. That a "Surveillance" video, nor "Information" [-document] provided to Defendant Dr. Goodman was never made a part of his portion of the "Report". Also, that "Information" or [-document] provided Defendant Dr. Goodman, was inconsistent with facts displayed in the "Surveillance" video, which shows Plaintiff moving the machinery by myself, with no assistance from anyone else on the date of injury. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

36. On April 24, 2018, Defendant Richard C. Davis, was specifically ask whether he had reviewed the "Surveillance" video, and he stated "YES".

37. In conjunction with paragraph 36., Defendant Richard C. Davis, admitted to the Worker's Compensation Law Judge that he had reviewed the "Surveillance" video relied on by Travelers' as its primary basis justifying their decision process,

and subsequently relied on by Defendant Dr. Goodman, in reaching his conclusion(s) in support of a denial of workers' compensation benefits. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

38. In conjunction with paragraphs 25., through 37., this "Surveillance" video, as reported, totally contradicts the "Information" [-document]provided to Defendant Dr. Goodman; and, Travelers primary bases for prolonging, delaying and/or denying the claim, which prolonged payment of benefits. Subjecting Plaintiff to a further delay or prolonging as well as placing him under extreme metal conditions and duress. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

39. In conjunction with paragraph 38., although, Defendant Dr. Goodman's advanced proposition, appear to have been reached without a review of the only essential piece of evidence, the "Surveillance" video, before reaching a conclusion based on that "Information" provided. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

40. In conjunction with paragraphs 6., through 39., 13 months later the employer and the insurer on August 22, 2019, as Plaintiff deepened into the above stated psychological conditions, sought to settle the worker's compensation benefits claim, for far less than its value. During this settlement process, Plaintiff inquired of Defendants Travelers, as to the medical bills that should be paid back to his Group Health Insurance Carrier, and that the settlement should include those bills, in case that the Group Health Insurance Carrier should come at me for the reimbursement of those paid bills. SEE EXHIBIT #13-A. Travelers ask if the Group Health Insurance Carrier, had a "Lien" on me, I told her "no" not at the present time. Travelers then informed Plaintiff that they would not give a $30.000 settlement check. Notice should be taken that Plaintiff's Group Health Insurance Carrier was owed back medical bills in the amount of about $50,000. This worker's compensation claim, is not at present being re-litigated, it is merely being referred to for the purpose of

16

establishing the intentional fraudulent misrepresentation which has caused an intentional personal injury to Plaintiff. SEE EXHIBIT #13-B, attached

41. In conjunction with paragraphs 40., as a direct result of Defendants' intentional fraudulent conduct, Plaintiff was compelled by the extreme hardships and psychological pressures under duress, to enter into that settlement. Although Defendants' incorporated a provision allegedly exempting them from liability for their BAD FAITH intentional conduct acts. As an attempt to forgo hardships and psychological pressures forced upon him by the intentional fraudulent conduct, and strategic retaliatory conspiracy set in motion by Defendants', to suffer Plaintiff in his financial, emotional and physical person. To avoid eviction, losing his transportation and having food to eat, Plaintiff compromised and released his worker's compensation benefits for a sum much less than the settlement value, and he was misled and induced to compromise and release his benefits by the Defendants. At no time relevant to the compromise and release agreement, did the Plaintiff believe that an intentional personal injury to Plaintiff or "INSURANCE FRAUD", was a part of the Wisconsin Worker's Compensation Act, or fraud of any kind, nor the RICO Act. Defendants' Bad Faith acts were an intentional and subsequent injury. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. SEE EXHIBIT #14, para. 2, attached

42. In conjunction with paragraphs 4., through 41., these acts of the Defendants were intentional, malicious and outrageous, and were meant to take advantage of Plaintiff's present physical and mental condition. That these tactics of harassment and delay were meant to cause the Plaintiff to give up on his rights under Wisconsin law, to minimize the amount of the Defendants' liability, drive him insane or to cause the Plaintiff to starve. That such fraudulent misrepresentation acts are in bad faith and with intent and effect of causing emotional distress.


### JULY 19, 2019 WORK-RELATED INJURY CLAIM

43. On July 19, 2019, Plaintiff received another work-related injury, while carrying out his work duties as a Sanitation worker for Defendant Kenosha Beef

International. On that date, Plaintiff reported the work injury according to the employer's procedures which had been processed through Defendants' Travelers as Claim No. FMH3128. Defendants' are presently utilizing the same tactics as they have in the June 20, 2018, work related injury stated above. At which time Plaintiff was working six days a week and receiving a third shift premium, with his sixth day at time and a half.

44. Defendants' Travelers, issued a denial letter, alleging that the medical records did not establish causation; this allegation caused AURORA HEALTH CARE, to contact Travelers' to clarify their medical records, which caused Travelers, to re-open their claim, and begin a farther investigation process. Plaintiff was initially compelled to result to his Group Health Insurance Coverage, in order to obtain this treatment. Which is believed again to defraud Plaintiff, out of pocket expenses, and the Group Health Insurance Carrier out of their paid medical bills that covered Plaintiff medical treatments. However, they did finally accept the claim and start paying benefits to Plaintiff in this claim.

45. In conjunction with paragraphs 43., and 44., Plaintiff begin receiving treatment for this injury through AURORA HEALTH CARE, Occupational Health Services, and was placed on Light Duty Restrictions July 22, 2019, where Plaintiff returned to work at the Sanitation Department, worked as such until July 26, 2019, at which time was taken off all abilities to work. On September 4, 2019, Plaintiff was again returned to work abilities, with Light Duty Restrictions. However, these Light Duty Restrictions were similar to those previously provided by his Care Providers. Because of the Employer had a misunderstanding of the Light Duty Restrictions, attempting to have Plaintiff to violate the Care Provider order, caused the Care Provider to amend the Light Duty Restrictions, as a result of the new Restrictions, Plaintiff was forced to work on First Shift, which reduced his wages, and the number days worked. There was no restriction that limited Plaintiff work abilities to preform those work duties. On October 31, 2019, Plaintiff was re-assessed by his Doctor, and the restrictions adjusted to allow Plaintiff to return to his Sanitation primary assignment.

46. In conjunction with paragraphs 40., 41., 43., and 45., Defendants Kenosha Beef International and, Natolie Murray informed Plaintiff that he was being

18

removed or re-assigned from his Third Shift Sanitation position, using as its bases the work related injury of June 20, 2018, and the July 19, 2019, to justify their decision, saying that because Plaintiff had received two work related injuries while working in the Sanitation Department, he was no longer allowed to work there. The policy being utilized by Defendants to re-assign Plaintiff to another Department and deny him to work when extra work is available, is the "Employer's Company Policy", believed to be put in place for employees whom are injured outside of work. Although, the Defendants' are using this "Employer Company Policy" against Plaintiff to circumvent their statutory obligations, owed to an injured work under the Work Compensation Act. This decision has and is causing injury to Plaintiff, in his personal, financial, and psychological aspects. As well as breaching their settlement agreement. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. SEE EXHIBIT # 16, attached

47. In conjunction with paragraphs 23., 40., 45., and 46., Defendants', especially, Defendant Tufano, as claim adjuster, and the primary coordinator in the Settlement Process, in regards to the June 20, 2018, work-related injury, during this negotiation period, Defendant Tufano, informed Plaintiff, after he had inquired that if he took the $10,000 settlement, he would be left with reimbursement Group Health Insurance company for the medical bills paid; that the settlement would have to be at lease, $30,000, so that Plaintiff would have money to negotiate with the Group Health Insurance; she stated, "that we do not have to worry about the amount owed to the Group Health Insurance company." This was false, because this Group Health Insurance company, whom is owed the amount it has paid on Plaintiff's medical bills, which should have been paid by Defendant Travelers through "reimbursement". However, Defendants' Tufano, and Travelers by misrepresenting the true facts, attempted through the settlement process to shift their liability for those medical bills to Plaintiff by playing on his psychological conditions, and use of deception by false representations. As it appear, these Defendants has placed the Plaintiff in a negative light, that present him as if he is trying to defraud his Group Health Insurance Company, by not reimbursing or seeking to have them reimbursed as required by the Worker's Compensation Act.

19

48. On or about October 8, 2019, Plaintiff confronted his UFCW Local 1473 Union Representative concerning Defendants' Kenosha Beef and Defendant Natolie Murray decisions on the Light Duty Restriction issues previously presented in paragraphs above.

49. Plaintiff was informed by his Union Representatives that they would take the concerns to the Employer/Defendant, to resolve my lose wages and change of the primary work assigned department.

50. On or about October 23, 2019, Plaintiff was informed by Union Representative Donna Casillas, that she had spoken with Pam Hood-Jones of Human Resources, and that they were seeking my time sheets and work files.

IV. Preliminary injunction and a temporary restraining order

51. In conjunction with paragraphs 48., through 50., Plaintiff had requested that he be given his lose wages which had been taken as a result of the Defendants' removing him from his primary Sanitation Department assignment holding prior to the work-related injury of July 19, 2019. Plaintiff since July 19, 2019, has been denied his six day, 40 hour work schedule, with the sixth day paid at time and a half, plus a hourly third shift rate; also, Plaintiff days and hours has been reduced to five days, with only 36 hours per week, with no possibility to make up those hours or receiving any over time as being provided other employees assigned to the North Production Department, although, the Department may work mandatory scheduled on weekends.

52. In conjunction with paragraphs 51., on November 5, 2019, Plaintiff was approached by a Union Representative, in regards to the concerns mentioned above, and was informed that he was confronted by the Employer, and alleged that they told him that if I did not stop complaining about the Light Duty Policy, that they would discontinue it and lay me off without any pay, and/or terminate me. On November 8, 2019, Plaintiff was called into the North Production Supervisor's office where he was asked to handover his Sanitation PPE, and was replaced with North Production PPE, thought to be an official act to re-assign. Defendants' are continuing to assert their misconduct as an attempt to further

20

achieve their scheme of intentional fraud. Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 389 (7th Cir. 1984); Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008). On or about November 13, 2019, Defendant Kenosha Beef, posted a mandatory work schedule assignment for all North Department Grinding/Production employees to report to work on November 16, 2019, to conduct their normal work schedules. Plaintiff reported as was scheduled per that order, to conduct his normal work duties which is performed by him Monday through Friday. However, on November 16, 2019, at about 9:00 am, he was confronted by his Supervisor, and informed that because of his Light Duty Restrictions, he was not allowed to work any over time in that position, and was instructed to leave at 11:00 am, after 4 hours of overtime. The other co-workers assigned to this North Department with Plaintiff was allowed to work the full 8 hours, in their normal positions. It is believed that this conduct is retaliatory, and is representing the will of Defendants Natolie Murray, under the authority of Defendants' Kenosha Beef.

## V. PRAYER FOR RELIEF

Accordingly, Plaintiff request a judgment in its favor and against

Defendants for:

### A. Intentional Infliction of Emotional Distress Claim of Plaintiff against Defendants

53. Defendants engaged in a "continuous pattern of intentional retaliation, harassment, abuse and unethical conduct," consider, Coleman v. American Universal INS Co, 86 Wis. 2d 615, 273 N. W. 2d 220 (1979); Kellar v. Lloyd, 180 Wis. 2d 162, 163, 509 N. W. 2d 87 (Ct. App. 1993), intentional fraudulent conduct, intentionally inflicting emotional distress on Plaintiff. This conduct includes the acts alleged by Plaintiff in the paragraphs of this complaint.

54. Plaintiff incorporate all prior paragraphs of this complaint.

1

55. Defendants' fraudulent conduct proximately caused an injury to Plaintiff, by intentional infliction of emotional distress, caused by their direct acts of delaying or prolonging payment, for which Plaintiff is entitled to damages exceeding $100.000.00

56. Consequential damages.

57. All cost of investigation and litigation, including attorney fees and costs and the value of time spent by Plaintiff litigating this matter to obtain justice.

58. Exemplary damages in the amount of three times of Defendants' actual damages.

59. Such further relief as the Court deem just and reasonable.

60. The Plaintiff incorporates by reference the allegations in paragraphs 1., through 54, and seeks Injunctive Relief against Defendants, et al., to restrain the Defendants and their agents from any further conduct as stated in the allegations outlined in this complaint, from terminating the Plaintiff, or subjecting him to their misconduct as a result of his work-related injuries.

## V. JURY DEMAND

61. Plaintiff hereby requests a trial by jury.

WHEREFORE, Plaintiff demands judgment against each Defendant in the amount exceeding $100,000 from each, for damages measured by the amount of benefits improperly withheld from him by Defendants' fraudulent conduct of prolonging payments, plus interest as provided by law, all tripled in accordance with RICO.

Dated this __ll__ day of __November__ , 2019

Respectfully submitted,

_Otto D__

**Olton Dumas, Pro se Plaintiff**
1519 Wisconsin Ave.
Beloit, WI.
        53511
Phone No. (262) 237-4436